| | | |
|---|---|---|
| **DONALD J. LEON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CAUSE NO. 1:11-CV-00268** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Donald Leon appeals to the district court from a final decision of the
Commissioner of Social Security ("Commissioner") denying his application under the Social
Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1]
(*See* Docket # 1.)  For the following reasons, the Commissioner's decision will be AFFIRMED.

## I.  PROCEDURAL HISTORY

Leon applied for DIB on December 18, 2008, alleging disability as of December 15,
2000, which he later amended to December 31, 2004. (Tr. 32, 120-22.)  Significant to this
appeal, Leon must show that he was disabled before his DIB-insured status expired on March 31,
2008, his date last insured ("DLI"). (Tr. 25); *see Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th
Cir. 1997) (explaining that a claimant must establish that he was disabled on or before his DLI in
order to recover DIB benefits).

The Commissioner denied his application initially and upon reconsideration, and Leon

---

[1] All parties have consented to the Magistrate Judge. (Docket # 21); *see* 28 U.S.C. § 636(c).

requested an administrative hearing. (Tr. 65-95.)  On February 24, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") Terry Miller, at which Leon, who was represented by counsel; his wife; and a vocational expert ("VE") testified. (Tr. 23-62.)  On May 26, 2010, the ALJ rendered an unfavorable decision to Leon, concluding that he was not disabled because he could perform his past relevant work as a loan officer and radio ad executive. (Tr. 8-18.)  The Appeals Council denied his request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-4, 398-401.)

Leon filed a complaint with this Court on August 5, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.)  In this appeal, Leon alleges that the ALJ improperly discounted his symptom testimony; failed to adequately consider the opinion of his treating physician, Dr. Reinhard; and improperly evaluated whether he could perform his past work at step four. (Opening Br. of Pl. in Soc. Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 7-15.)

## II.  FACTUAL BACKGROUND[2]

### A.  Background

At the time of the ALJ's decision, Leon was fifty-four years old, had an eleventh grade education, and had past relevant work as a loan officer and radio ad executive. (Tr. 17, 150-52, 160-61, 209.)  Leon alleges that he became disabled due to a history of low back pain with radiculopathy as a result of lumbar spine degenerative disk disease, status-post discectomy surgery in June 2006, and a history of gouty arthritis of the feet. (Opening Br. 2.)

At the hearing, Leon, who is almost six feet tall and weighed 230 pounds, testified that he

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 401-page administrative record necessary to the decision.

lives with his wife in a two-story home. (Tr. 29-30.)  He drives a car and, after his alleged onset

date, obtained a chauffeur's license. (Tr. 30-31.)  On a typical day, Leon fixes himself simple

meals, watches television, and naps on the couch. (Tr. 49.)  His wife performs most of the

household tasks, but he helps manage the finances and goes grocery shopping, using an electric

cart. (Tr. 51-52, 55-56.)  He gets winded bending over to put on his socks and must wear slip-on

shoes. (Tr. 46.)  He attends church weekly. (Tr. 52.)

Leon testified that gouty arthritis was his main problem as of his DLI (Tr. 39, 55); the

pain he experienced from gout caused him to walk with a limp (Tr. 40-41).  When he

experienced a gout flare-up, which lasted anywhere from four to eight weeks, he could not bear

weight on his feet, had to elevate them higher than his heart, and could not wear shoes or socks.

(Tr. 41, 43, 53.)  During a flare-up, Leon spent his days on the couch and only got up to use the

restroom, using a cane when doing so. (Tr. 41, 43, 45.)  He took various medications for gout

and was also prescribed Oxycodone and other pain relievers for his back, but preferred to take

Aleve because the prescription medications made him sleepy. (Tr. 38-41.)  He also stated that he

had bursitis in his right elbow, which caused his right arm to be "completely paralyzed and

useless" in that he could not raise his arm to wash his hair or feed himself. (Tr. 38, 42.)

As to his physical capacity, Leon testified that he could walk "maybe a couple of blocks

before [his] left ankle swells up almost twice the size of the right" and got "very, very winded"

when doing so. (Tr. 36.)  He estimated that after walking two blocks or standing for ten minutes,

his pain reached a "five" on a ten-point scale. (Tr. 44-45.)  He had no problems, however, with

sitting. (Tr. 45.)  He avoided all lifting or carrying and complained of some problems with

grasping and gripping in that he occasionally dropped items.[3] (Tr. 36, 46.)

## B. Relevant Medical Evidence Prior to Leon's DLI

In April 1997, Leon was hospitalized with right knee and ankle swelling, which was thought to be gout. (Tr. 215-17.) Tests for gout, however, were negative. (Tr. 215.) He was placed on Indocin and did very well, regaining full range of motion in his knee and ankle. (Tr. 215.)

Eight years later, in June 2005, testing showed a high uric acid result. (Tr. 312-15.) In February 2007, Leon went to the emergency room due to pain in his left great toe, reporting that he had been treated for gout in the past; he was diagnosed with acute trauma and inflammation of the left great toe and given medication. (Tr. 269-70.) In September 2007, Leon returned to the emergency room for a recent onset of toe pain, reporting "recurrent problems in the past with gout." (Tr. 260.) Two months later, Leon saw Dr. David Reinhard, his family practitioner, for a gout flare-up in his right foot, which had begun two days earlier. (Tr. 283.) On physical exam, Dr. Reinhard observed that his right great toe showed quite a bit of redness, swelling, and tenderness, which was consistent with gout. (Tr. 283.) Dr. Reinhard refilled his prescriptions of Colchicine and Oxycodone. (Tr. 283.)

On January 30, 2008, Leon called Dr. Reinhard's office and reported that he could not afford his medications because he had been laid off work. (Tr. 282.)

## C. Relevant Medical Evidence After Leon's DLI

At Leon's appointment on April 16, 2008, his wife told Dr. Reinhard that Leon drank "a fairly high amount of alcohol." (Tr. 281.) Dr. Reinhard then had a long discussion with Leon

---

[3] Leon's wife also testified at the hearing, essentially corroborating his testimony. (Tr. 54-56.)

about the need to significantly decrease his alcohol intake and also recommended a dietary consult. (Tr. 281.) Later that month, Leon returned to Dr. Reinhard for right ankle pain, who documented that Leon had gout and acute flare-ups of gouty arthritis from time to time. (Tr. 281.) He wrote that Leon had previously used Cultazine, which had "stopped these acute attacks for him." (Tr. 281.) Leon told Dr. Reinhard that he needed treatment immediately because he was driving to New York. (Tr. 281.) Dr. Reinhard's assessment was gouty arthritis; he placed Leon on Allopurinol. (Tr. 281.) Eight months later, in December, Leon told Dr. Reinhard that he was no longer drinking alcohol. (Tr. 345.)

In February 2009, Dr. J.V. Corcoran, a state agency physician, reviewed Leon's record and completed a physical RFC assessment form, concluding that he could lift or carry twenty-five pounds frequently and fifty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 326-33.) Dr. Corcoran's opinion was later affirmed by a second state agency physician. (Tr. 334.)

In April 2009, Leon told Dr. Reinhard that his gout pain had become almost constant and that his last pain-free day was four months earlier. (Tr. 338.) In the last several months, his left calf had become swollen and painful, particularly after minimal walking. (Tr. 342.) On physical exam, he had some chronic swelling in the first MTP joints bilaterally, but no redness or warmth. (Tr. 338.)

The following month, Leon told Dr. Reinhard that he had consumed several beers before his liver test was conducted. (Tr. 337.) Dr. Reinhard planned to consult a rheumatologist about other treatment options for Leon's gout. (Tr. 337.) In June, Dr. Reinhard saw Leon for

inflammatory arthritis of the elbow. (Tr. 336.)  In July, Dr. Reinhard wanted to start him on Allopurinol and wrote that he saw "no contraindication to him doing the [c]haueffer's job." (Tr. 335.)  Later that month, Dr. Reinhard instructed Leon to stop the Allopurinol when having an acute gout episode. (Tr. 335.)

In August 2009, Dr. Reinhard completed a medical source statement on Leon's behalf in which he was asked to provide a retrospective opinion as of Leon's DLI. (Tr. 354-58.)  Dr. Reinhard listed diagnoses of gout, hypertension, hyperlipidemia, and atrial fibrillation, indicating that Leon had experienced a gout flare-up every month or two that left him barely able to walk. (Tr. 354.)  He also stated that Leon had experienced severe, sharp foot and ankle pain, together with swelling and tenderness, and opined that Leon could not work full time because he was able to sit for only two hours and stand or walk for just two hours. (Tr. 355-56.)  He also wrote that Leon needed to elevate his legs to waist level seventy-five percent of the workday; could lift ten pounds occasionally and twenty pounds rarely, but never fifty pounds; and would be absent from work more than three days per month. (Tr. 357.)

In October 2009, Dr. Reinhard noted that Leon's diabetes was out of control, that he was feeling winded easily, and would take naps in the middle of the day. (Tr. 361.)  He was not, however, experiencing pitting edema in his extremities. (Tr. 361.)  Later in October, Dr. Reinhard saw Leon for a follow-up of his right elbow pain, which Dr. Reinhard thought was probably gout. (Tr. 367.)  In November, Leon was seen for, among other things, elbow pain. (Tr. 366.)  In December, he was in for painful knuckles and bumps on his left foot. (Tr. 366.)

In January 2010, Leon told Dr. Reinhard that his gout had been under fairly good control. (Tr. 362.)  He stated, however, that he had never quite gotten rid of the acute gout episodes and

thus had not started the Allopurinol. (Tr. 362.)  He reported that he felt very tired during the day and somewhat depressed. (Tr. 362.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003).  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

### IV.  ANALYSIS

#### A.  The Law

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On May 26, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 8-18.) He found at step one of the five-step analysis that

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

although Leon had worked after his alleged onset date, it did not rise to the level of substantial gainful activity. (Tr. 10.)  At step two, the ALJ concluded that Leon had the following severe impairments as of his DLI: a history of low back pain with radiculopathy as a result of lumbar spine degenerative disk disease, status post discectomy surgery in June 2006, and a history of acute gouty arthritis of the feet. (Tr. 11.)  At step three, the ALJ determined that Leon's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 11.)

Before proceeding to step four, the ALJ determined that as of his DLI Leon's symptom testimony was not reliable to the extent it was inconsistent with the following RFC (Tr. 62):

> [T]hrough the date last insured, the claimant has the residual functional capacity to perform the full range of sedentary work . . . (i.e. sitting up to 6 hours out of an 8 hour workday; standing/walking a total of 2 hours, in combination, during an 8 hour workday, and lifting/carrying/pushing/pulling only up to 10 pounds at most), further reduced by only occasional climbing ramps and stairs, balancing, stooping, kneeling and crouching.

(Tr. 12.)

Based on this RFC and the VE's testimony, the ALJ concluded at step four that as of his DLI, Leon was capable of performing his past relevant work as a loan officer and radio ad executive. (Tr. 17.)  Accordingly, Leon's claim for DIB was denied. (Tr. 17-18.)

### C.  The ALJ's Credibility Determination Will Not Be Disturbed

Leon contends in one of his three arguments that the ALJ improperly discounted the credibility of his symptom testimony.  The ALJ's credibility assessment, however, is amply supported.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).  If an ALJ's determination is grounded in the record and he articulates his analysis of the

evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, Leon testified that he was disabled prior to his DLI in that he had gout attacks that lasted four to eight weeks where he could not even put his feet on the floor and needed to elevate them higher than his heart. (Tr. 40.)  He stated that prior to his DLI the longest he went without a gout attack and pain was one month. (Tr. 43.)  The ALJ, however, discredited Leon's symptom testimony on several bases.

First, the ALJ deduced that although Leon had problems with gout prior to his DLI, the medical records did not reflect the prolonged and excruciating periods of pain that he described. (Tr. 14.)  To illustrate this point, the ALJ catalogued the medical evidence and treatment that Leon received prior to his DLI:

> The medical evidence shows that as far back as April 1997, the claimant was briefly hospitalized for right knee and left ankle swelling.  On April 14, 1997, the claimant went to the Parkview Hospital Emergency Care Center due to right knee and left ankle pain. . . . .  The claimant reported an increase in pain over the past 3 weeks while at work driving an ice cream truck. . . . .  The claimant's uric acid level was found to be only mildly elevated.  The claimant did well on medication therapy.  It was ultimately concluded that the claimant may have a rheumatologic condition, possibly gout, due to elevation in uric acid.
>
> Other than this fairly remote treatment of lower extremity problems due to possible gout back in 1997, the record is extremely sparse with respect to any major treatment for gout problems prior to March 2008, and certainly the

treatment records do not support the extreme and excruciating pain episodes from gout that the claimant alleges during the period on or prior to March 2008.

(Tr. 14.)

The ALJ then went on to explain that Leon had two emergency room visits in 2007 due to big toe pain. (Tr. 14.) At the first visit, the record indicates that he was there primarily to get pain medication, but exhibited no excruciating pain behaviors; at the second visit, Leon said that the pain had begun just the night before. (Tr. 14.) At both visits, the doctors observed mild to moderate swelling and tenderness of the toe, but no abnormalities of the foot; they prescribed medication. (Tr. 14-15.) The ALJ noted that also in 2007 Leon saw Dr. Reinhard, his primary care physician, for a gout flare-up in his right foot that had lasted two days, stating that he was almost of out Colchicine and Oxycodone and wanted refills; his right great toe showed a lot of redness, swelling, and tenderness at the base of the first MTP joint. (Tr. 15.)

The ALJ then contrasted this pre-DLI medical evidence, or lack thereof, with records dated after Leon's DLI—specifically, April 28, 2008—in which he complained to Dr. Reinhard that he could not sleep at night due to constant right ankle pain and that he needed medication because he was driving to New York. (Tr. 15.) On examination, Leon's ankles were hot and tender to palpation, and range of motion was restricted due to pain. (Tr. 15.) The ALJ concluded that this record suggested that Leon may indeed have been under acute distress due to his gouty arthritis, in contrast to his records from 2007. (Tr. 15.)

Leon does not dispute that the medical evidence pertaining to his gout prior to his DLI was sparse. Rather, he attempts to minimize this lack of evidence, arguing that "[m]erely because he did not go in for every gout flare-up did not mean that they failed to occur . . . ." (Opening Br. 15.)

But "[t]he discrepancy between the degree of pain attested to by the witness and that suggested by the medical evidence is probative that the witness may be exaggerating his condition." *Powers*, 207 F.3d at 435-36. "[A]n ALJ may consider the lack of medical evidence as probative of the claimant's credibility." *Smith v. Apfel*, 231 F.3d 433, 439 (7th Cir. 2000); *see Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) ("[S]ubjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 633 (N.D. Ill. 2009) (explaining that an ALJ "may properly discount portions of a claimant's testimony based on discrepancies between [the c]laimant's allegations and objective medical evidence"); 20 C.F.R. § 404.1529(c)(2); SSR 96-7p. "It is axiomatic that the claimant bears the burden of supplying adequate records and evidence to prove their claim of disability." *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(c) ("You must provide medical evidence showing that you have an impairment and how severe it is during the time you say that you were disabled.")). Here, Leon has failed to carry his burden of providing medical evidence to support his claims of disabling gout pain prior to his DLI.

The ALJ also emphasized that the relevant records prior to Leon's DLI showed that Leon did well with his Colchicine and that it was fairly effective in resolving much of the gout pain. (Tr. 14-15.) The Social Security "regulations expressly permit the ALJ to consider a claimant's treatment history" when assessing the credibility of his complaints of disabling symptoms. *Simila v. Astrue*, 573 F.3d 503, 519 (7th Cir. 2009) (discounting the severity of claimant's complaints where his treatment was "relatively conservative" and "inconsistent with [his] complaints"); *see Ellis v. Astrue*, No. 2:09–cv–145, 2010 WL 3782265, at *20 (N.D. Ind. Sept.

30, 2010) (affirming the ALJ's discounting of claimant's complaints given the discrepancies between her self-reported symptoms and the lack of treatment for the purported condition); 20 C.F.R. § 404.1529(c)(3); SSR 96–7p. The ALJ concluded from the medical evidence of record that the treatment for Leon's gout symptoms prior to his DLI was relatively conservative and effective, and there is no indication that such conclusion is "patently wrong."

In addition, the ALJ reviewed Leon's daily activities when assessing his credibility. In particular, he noted that Leon obtained a chauffeur's license after his DLI and that Dr. Reinhard saw no contraindication in Leon performing that job. (Tr. 15); *see Schmidt*, 395 F.3d at 746-47 (considering claimant's performance of daily activities as a factor when discounting claimant's credibility); 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

The ALJ also noted in his credibility assessment that Leon consumed alcohol prior to his DLI, commenting that it "more than likely precipitated and/or aggravated/intensified his gout flare-ups during that time." (Tr. 14.) Leon takes issue with the ALJ's reasoning in this respect, asserting that he "played doctor," *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 579 (7th Cir. 2003), because he failed to cite a medical source indicating that Leon's gout was aggravated by alcohol use. (Opening Br. 14.) And even if the ALJ had done so, Leon argues, he erred by failing to follow the proper steps before concluding that he would not have been disabled but for his alcohol use.

Perhaps the ALJ did misstep in this regard, as the record evidences that Dr. Reinhard's "long discussion" with Leon about the need to significantly decrease his alcohol consummation occurred in connection with his cholesterol and liver test results, not specifically his gout. (*Compare* Tr. 15, *with* Tr. 281.) But at the hearing, Leon testified that Dr. Reinhard at some

point "might have" made a connection between the gout attacks and his drinking; he was "not sure." (Tr. 48.)  Regardless, when reading the ALJ's opinion as a whole, which the Court is required to do, *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004), the ALJ's credibility determination is still amply supported by the other evidence of record discussed above. *See McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011) (acknowledging that the ALJ's credibility determination was "not without fault" in two respects, but affirming it based on other substantial evidence cited by the ALJ); *Kittelson v. Astrue*, 362 F. App'x 553, 558 (7th Cir. 2010) (unpublished) (affirming the ALJ's adverse credibility finding where substantial evidence supported it even though it "was not perfect").  Accordingly, the ALJ's credibility determination will not be disturbed.

### D.  The ALJ's Consideration of Dr. Reinhard's Opinion Is Supported by Substantial Evidence

Next, Leon argues that the ALJ erred by discounting the opinion of his treating family practitioner, Dr. Reinhard.  To review, Dr. Reinhard penned a medical source statement on Leon's behalf in August 2009, indicating that as of his DLI, Leon experienced a gout flare-up every month or two that left him barely able to walk; could not work full time because he was able to sit for only two hours and stand or walk for two hours; needed to elevate his legs to waist level seventy-five percent of the workday; and would be absent more than three days of work per month. (Tr. 354-57.)

The Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and  circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. § 404.1527(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature

14

and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen*, 314 F.3d at 287; 20 C.F.R. § 404.1527(c)(2). In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(c); *see Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore,"[a] claimant . . . is not entitled to disability benefits simply because a physician finds that the claimant is 'disabled' or 'unable to work.'" *Clifford*, 227 F.3d at 870. "The Commissioner is charged with determining the ultimate issue of disability." *Id.*; *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see* 20 C.F.R. § 404.1527(d)(1); SSR 96-5p. In fact, "treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p; *see also*; *Frobes v. Barnhart*, No. 06 C 1305, 2006 WL 3718010, at *8 (N.D. Ill. Nov. 20, 2006); 20 C.F.R. § 404.1527(d)(3). "Giving controlling weight to such opinions would, in effect, confer upon the treating source the authority to make the determination or decision about whether the individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." SSR 96-5p; *see Frobes*, 2006 WL 3718010, at *8.

Here, the ALJ penned no less than five paragraphs about Dr. Reinhard's medical records,

one of which specifically addressed his August 2009 medical source statement. (Tr. 13-16.) The ALJ, however, ultimately chose to assign more weight to the opinions of the state agency physicians than to Dr. Reinhard's restrictive opinion. (Tr. 17.) In doing so, the ALJ explained that Dr. Reinhard's retrospective medical source statement was not supported by the contemporaneous medical records for that period in that (1) they did not reflect that Leon needed to elevate his legs or use a cane; (2) documented "only very periodic[]" visits for gout problems; and (3) indicated that Leon, even when he was seen, reported "only mild to moderate pain, at most." (Tr. 16.)

Leon attempts to challenge each of the ALJ's cited reasons for discounting Dr. Reinhard's opinion. First, he nitpicks the ALJ's discounting of Dr. Reinhard's retrospective statement that Leon needed to elevate his legs and use a cane prior to his DLI, contending that the ALJ applied an incorrect standard. *See Rice*, 384 F.3d at 369 (explaining that when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading rather than nitpicking at it"). He emphasizes that under SSR 96-2p a medical opinion does not have to be "consistent" with all other evidence to merit weight, it just needs to be "not inconsistent." (Opening Br. 12.) But Leon's argument "amounts to nothing more than a dislike of the ALJ's phraseology." *Rice*, 384 F.3d at 371. Boiled down, the ALJ's point was that Dr. Reinhard's medical records dated prior to the DLI did not reflect Leon's need to elevate his legs or use of a cane, which undercuts the credibility of Dr. Reinhard's retrospective assertion to the contrary. *See, e.g.*, *Slaughter v. Astrue*, No. 08-cv-2776, 2010 WL 4625079, at *8 (N.D. Ill. Nov. 5, 2010) (discounting physician's RFC assessment where it lacked the evidentiary support of his contemporaneous treatment notes); *see generally Stephens v. Heckler*, 766 F.2d 284, 288 (7th

16

Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

Leon tries this same tactic when challenging the ALJ's observation that Dr. Reinhard saw him for "only very periodic[]" medical visits for gout prior to his DLI. Although his argument is somewhat difficult to discern, he appears to be contending that Dr. Reinhard's restrictive medical source statement is "not inconsistent" with the fact that Leon also had to visit the emergency room twice in 2007 due to pain in his great toe, presumably from gout. But again Leon's nitpick is futile. The ALJ was, in essence, observing that the severity of the restrictions articulated in Dr. Reinhard's retrospective opinion was *not* supported by the contemporaneous medical records for that period, which were sparse and reflected only minimal to moderate pain complaints. *See, e.g.*, *Slaughter*, 2010 WL 4625079, at *8. The relevant inquiry is whether Leon's pain was of a disabling severity during the relevant period, not the fact that he was diagnosed with gout prior to his DLI. *See, e.g., Betancourt v. Apfel*, 23 F. Supp. 2d 875, 879, 882 (N.D. Ill. 1998) (determining that the claimant was not disabled because her symptoms were not of disabling severity prior to her date last insured, though she was diagnosed with a progressive disease during the relevant period).

And finally, Leon challenges the ALJ's comment that he thought Dr. Reinhard was likely describing Leon's current condition in August 2009, rather than retrospectively as of his DLI. (Tr. 16 ("Although Dr. Reinhard likely was describing the claimant's abilities at the time the assessment was made in August 2009, this very limited ability is not consistent with treatment records relating back to March 2008 and previously.").) Leon emphasizes that the questionnaire prepared by his lawyer and completed by Dr. Reinhard makes it very clear that the answers were

retrospective as of his DLI.

But the ALJ explicitly acknowledged earlier in his decision that the medical source statement, on its face, indicated that the opinions were intended to be retrospective. (Tr. 15 ("Dr. Reinhard also completed a medical source statement dated August 21, 2009, for a retrospective opinion with respect to the claimant's physical capacity as of March 31, 2008, at the attorney's request.").) It appears that the ALJ's stray comment merely contemplated one possible explanation for the significant discrepancy he saw between Dr. Reinhard's contemporaneous and retrospective documentation for the relevant period. In any event, to reiterate, this discrepancy undercuts the credibility of Dr. Reinhard's medical source statement, *see, e.g.*, *Slaughter*, 2010 WL 4625079, at *8, and thus this comment by the ALJ is not pivotal.

In sum, the ALJ sufficiently evaluated Dr. Reinhard's opinion and adequately explained his rationale for assigning it the weight that he did, allowing this Court to adequately trace his path of reasoning with respect to the assignment of Leon's RFC. *See Books*, 91 F.3d at 980. The Court will not accept Leon's invitation to merely substitute our judgment for the Commissioner at this juncture. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000) (emphasizing that the Court is not allowed to substitute its judgment for the ALJ by "reweighing evidence" or "resolving conflicts in evidence"). Consequently, his second argument does not merit a remand of the Commissioner's final decision.

### E. The ALJ's Step-Four Finding Is Supported by Substantial Evidence

In addition, Leon argues that the ALJ's step-four finding that he could perform his past relevant work, both as he actually performed it and as it is generally performed, is flawed and must be remanded. Leon's assertion that the ALJ's step-four finding requires a remand,

however, is ultimately unavailing.

At the hearing, the VE testified that a hypothetical person of Leon's age, education, work history, and RFC could perform Leon's past relevant work as a "loan officer," both as he actually performed it and as it is generally performed, and a "radio ad executive," as he actually performed it, explaining that such jobs were at the sedentary level and thus consistent with Leon's RFC.[5] (Tr. 57.)  Accordingly, in reliance on the VE's testimony, the ALJ concluded at step four that Leon was not disabled. (Tr. 17.)

Leon points to several flaws in the ALJ's step-four finding.  First, he notes that the ALJ mistakenly penned that he could also perform his past job as "radio ad executive" as it is generally performed.  Indeed, the ALJ misspoke in this regard (Tr. 17), as the VE testified that Leon could perform this job as he actually performed it at the sedentary level, *not* as it is generally performed at the light exertional level (Tr. 57-58).  But "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989).

Here, a remand to correct the ALJ's misstatement would not lead to a different result.  A claimant is not disabled if he can perform his past work "either as [he] actually performed it *or* as it is generally performed in the national economy." *Chandler v. Astrue*, No. 1:11-cv-1593, 2012 WL 4897777, at *5 (S.D. Ind. Oct. 15, 2012) (emphasis in original) (citing 20 C.F.R. § 404.1560(b)).  Thus, the fact that Leon could not perform his past work as a "radio ad executive"

---

[5] The VE testified that such hypothetical person could also perform Leon's past work as a "sales representative hotels," which was at the sedentary level as well. (Tr. 57.)  The ALJ, however, concluded at step one that Leon's three-month stint as a hotel sales representative was an unsuccessful work attempt and thus did not rely on this job for his step-four finding. (Tr. 10, 17.)

as it is generally performed in the national economy is not outcome-determinative.

This segues to Leon's second point—that the ALJ relied on flawed testimony by the VE concerning how he actually performed his past relevant work as a "loan officer" and "radio ad executive." Specifically, Leon argues that the VE incorrectly testified that he performed these jobs at the sedentary level (Tr. 57 ("I believe the information I have indicated that he performed [the radio ad executive job] at the sedentary level as well.")), which generally requires no more than two hours of standing or walking in an eight-hour workday, SSR 96-9p, 1996 WL 374185, at *3. Indeed, in Leon's Work History Report, he represented that his "loan officer" job involved 4 hours of walking or standing and that his "radio ad executive" job required 6 hours of walking or standing (Tr. 150-52), which conflicts with the testimony provided by the VE at the hearing.

Ultimately, however, this discrepancy is not pivotal, as the ALJ *also* concluded that Leon could perform his past job as a "loan officer" as it is generally performed in the national economy. Leon, not easily deterred, argues that the occupational title of "loan officer" does not accurately reflect the duties that he actually performed in that job, even though that was the job title he listed on his Disability Report and Work History Report. (Tr. 150, 160.) He now claims that his "loan officer" job was actually more like an "office helper" because he did not "request the documents" or "interview" loan applicants regarding their income, debt, and credit history as described in the job description for "loan officer" in the Dictionary of Occupational Titles ("DOT"), but instead collected personal financial information from customers applying for loans, entered the loan application information into a computer, obtained customers' signatures on loan documents, transported the documents to the bank, and attended the loan closing with the

customers. (Opening Br. 8-9.)

But Leon's objection comes too late. "An ALJ is justified in relying on a VE's testimony unless there is an apparent conflict between the VE's testimony and the DOT." *Penny v. Astrue*, No. 08-2270, 2010 WL 1931312, at *7 (C.D. Ill. May 13, 2010) (citing SSR 00-4p). "If a claimant's attorney does not question the basis of the VE's testimony, he forfeits that objection unless the error is apparent." *Id.* (citing *Barrett v. Barnhart*, 355 F3d 1065, 1067 (7th Cir. 2004)). Leon, who was represented by counsel at the hearing, "had ample opportunity at the hearing to cross-examine the VE, and in fact did ask the VE questions." *Id.*

"In this case, the record reflects that [Leon's] attorney made no objection at the hearing to the VE's choice of job titles of [Leon's] past work." *Id.* "The VE classified [Leon's] past relevant work based on his expert knowledge in the field and the information provided by [Leon] in [his] work history report." *Id.* "The Court will not speculate at this point as to the VE's determination of [Leon's] job titles under the [DOT]." *Id.* "[A]n ALJ is entitled to presume that a claimant represented by counsel in the administrative hearings has made [his] best case."[6] *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988). Accordingly, Leon's step-four challenge comes too late, and the Commissioner's final decision will be affirmed.

---

[6] Citing a Tenth Circuit case, *Winfrey v. Chater*, 92 F.3d 1017, 1025 (10th Cir. 1996), Leon also argues that the ALJ erred by failing to make specific findings about the mental and physical demands of Leon's past work. But in *Winfrey*, the ALJ found that the claimant suffered from some degree of mental impairment. *Id.* ("[W]hen the claimant has a mental impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety . . . in order to determine if the claimant's mental impairment is compatible with the performance of such work.").) Here, Leon never alleged that he had a mental impairment prior to his DLI, nor does the record demonstrate any mental impairment. Therefore, *Winfrey* is distinguishable. *See, e.g., Rabon v. Astrue*, 464 F. App'x 732, 735 (10th Cir. 2012) (unpublished).

**V.  CONCLUSION**

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Leon.

SO ORDERED.

Enter for this 4th day of March, 2013.

S/Roger B. Cosbey_____
Roger B. Cosbey,
United States Magistrate Judge
